IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs September 17, 2019

**PORSCHA J. MEDARIES v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2015-B-1238     Cheryl A. Blackburn, Judge**

_____

**No. M2018-01656-CCA-R3-PC**

_____

The Petitioner, Porscha J. Medaries, appeals the post-conviction court's denial of her petition for post-conviction relief in which she challenged her conviction for attempted first degree murder. On appeal, the Petitioner alleges that she received ineffective assistance of counsel and that her guilty plea was not knowingly entered. After a review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., and CAMILLE R. MCMULLEN, JJ., joined.

C. LeAnn Smith, Nashville, Tennessee, for the appellant, Porscha Medaries.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Glenn Funk, District Attorney General; and Pamela Anderson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL BACKGROUND**

**Plea Hearing**

The Petitioner returned to the scene of a previous shooting with her co-defendants, two of whom fired shots which penetrated three separate dwelling units, resulting in severe injuries to a child. A Davidson County Grand Jury indicted the Petitioner and three co-defendants for two counts of attempted first degree murder of the victims who

were the intended targets of the shooting, one count of attempted first degree murder with serious bodily injury in which the victim was the child, three counts of employing a firearm during the commission of a dangerous felony, and three counts of reckless endangerment by firing into an occupied habitation for each dwelling unit. The Petitioner pleaded guilty to one count of attempted first degree murder without serious bodily injury, which was the lesser-included charge and reduced the released eligibility date from eighty percent of the sentence to thirty-five percent of the sentence, and three counts of reckless endangerment by firing a gun into an occupied habitation. The State dismissed her remaining charges as part of the plea agreement. The plea agreement set forth that the Petitioner would serve fifteen to twenty-five years for the attempted first degree murder conviction and six years for each of the reckless endangerment convictions. The agreement stated that the sentences for the reckless endangerment convictions would be served concurrently with each other and with the attempted murder conviction. The trial court held a separate sentencing hearing for the attempted first degree murder conviction and imposed a twenty-one-year sentence for the attempted first degree murder conviction. The Petitioner received an effective sentence of twenty-one years to be served at thirty percent.

According to the State's recitation of the facts at the plea hearing, the Petitioner, Ms. Vadra Jackson, and Ms. Aurionne Martin went to a residence where an altercation broke out, and someone fired shots in the Petitioner's direction, hitting her vehicle. The Petitioner and Ms. Jackson left the residence, and the Petitioner contacted her uncles, Mr. Robert Medaries and Mr. Jamar Medaries. A short while later, the Petitioner, Ms. Jackson, Mr. Robert Medaries, who was not charged, and Mr. Jamar Medaries returned to the residence. Mr. Brandon Scott, another co-defendant, also arrived at the residence. The prosecutor stated, "[The Petitioner] and Ms. Jackson both were outside and began to make statements that were overheard by witnesses to the effect of that the house was fixing to be shot up … that, quote, we are fixing to light this b***h."

Mr. Jamar Medaries and Mr. Scott both brought guns to the residence, and they opened fire on the residence. A bullet entered the nearby home of the eleven-year-old victim and penetrated his skull. The victim was in critical condition and suffered permanent, severe brain damage affecting his mental and physical faculties.

During the guilty plea hearing, the Petitioner confirmed that the prosecutor's recitation of facts was generally correct. She agreed that she and trial counsel discussed the charges and the possible sentences. The trial court explained that there was going to be a separate sentencing hearing and that the Petitioner would receive a sentence between fifteen and twenty-five years for attempted first degree murder. The Petitioner acknowledged that she thoroughly discussed discovery and any possible defenses with trial counsel. She initialed every paragraph of the plea petition and agreed that she did so

as she and trial counsel reviewed it. The Petitioner indicated that she was satisfied with trial counsel's representation. The trial court asked the Petitioner if she could "think of anything you had asked him to do that he has not done," and the Petitioner answered in the negative. The trial court accepted the Petitioner's plea and scheduled a sentencing hearing.

## Sentencing Hearing

The trial court held a joint sentencing hearing with the Petitioner and Mr. Scott. Detective John Grubbs with the Metropolitan Nashville Police Department described the events that happened at the residence on the day of the shootings. Detective Grubbs recalled that the Petitioner was involved in an altercation with two other women and that one of the women fired a gun in the Petitioner's direction. Shortly after this incident, the Petitioner and her uncles returned to the residence, and a second shooting occurred. Detective Grubbs confirmed that there were several children who were outside of the residence at the time of the first shooting, including the eleven-year-old victim. He also stated that when the Petitioner returned to the scene, she made a threat that the house "was about to be lit up," but Detective Grubbs acknowledged that he was not certain that it was the Petitioner and not Ms. Jackson who made the statement.

Ms. Sharnessa Sparks, a family acquaintance of the eleven-year-old victim, testified that she was engaged to the victim's uncle and that she had known the victim for approximately six years. She described the victim as "active, fun, happy, [and] very independent" prior to the shooting. Ms. Sparks recalled that after the shooting, the victim was hospitalized for a period of months and underwent many surgeries. After the victim was discharged from the hospital, he was transferred to a rehabilitation facility in Atlanta, Georgia. At the time of the hearing, the victim had completed rehabilitation but was still unable to use the right side of his body or speak in complete sentences.

Mr. Scott, one of the co-defendants, testified that on the day of the shooting, he received a telephone call from Mr. Jamar Medaries informing him that someone had "shot at" the Petitioner. Mr. Jamar Medaries asked Mr. Scott to come to the residence where the shooting occurred. When Mr. Scott arrived at the residence, Mr. Jamar Medaries was standing outside, and the Petitioner and Ms. Jackson were yelling at someone who was standing inside the doorway. Mr. Scott did not recall seeing Mr. Jamar Medaries holding a gun at that point. Mr. Scott stated that Mr. Jamar Medaries was the first one to fire his weapon. When he heard gunfire, Mr. Scott testified that his reaction was to grab his gun and fire it six or seven times.

Ms. Lakita Reid, the Petitioner's mother and the sister of Mr. Jamar Medaries and Mr. Robert Mediares, testified that she was very surprised by the Petitioner's actions and

that the Petitioner was "normally the one [who] will go get help versus trying to take matters into her own hands." Ms. Reid described the Petitioner as "very calm [and] laid back."

The Petitioner testified that she was twenty years old at the time of the shooting and that her prior criminal history consisted of one misdemeanor conviction for possession of marijuana. She was on probation for that offense at the time of the shooting. She graduated high school, attended Tennessee State University for one year, and had maintained employment. She had completed several programs in confinement, including anger management.

The Petitioner testified that she went to the residence with her girlfriend, Ms. Martin, who needed to retrieve clothing she had left there, and with Ms. Jackson. The Petitioner stayed in the car while Ms. Martin and Ms. Jackson went in the house. The Petitioner heard yelling and saw Ms. Martin with blood running down her face through an upstairs window. The Petitioner said that Ms. Martin threw two cell phones out the window to Ms. Jackson and that it appeared that she was trying to jump out of the window when another woman, Ms. Alexandria Taliaferro,[1] pulled her back inside. Ms. Martin warned the Petitioner and Ms. Jackson to move, and they ran to the car as Ms. Taliaferro opened the door and began shooting in the Petitioner's direction. The Petitioner called Mr. Robert Medaries and told him that someone attempted to shoot her. Mr. Robert Medaries told the Petitioner to call Mr. Jamar Medaries. After speaking with Mr. Jamar Medaries, she met him, and they drove in separate cars to the residence, where they met Mr. Robert Medaries.

The Petitioner estimated that between twenty and thirty minutes had passed from the time that she left the residence to the time that she returned. She stated that she believed Ms. Martin was being held in the house against her will. She did not call the police because she was unsure of what was happening in the house. There was no discussion of bringing a gun or shooting at the house. When the Petitioner knocked on the door, Ms. Martin asked the Petitioner for her belongings that were in the Petitioner's car and told the Petitioner that she did not want to leave. Ms. Vadra Jackson retrieved Ms. Martin's belongings from the Petitioner's car. The Petitioner and Ms. Jackson started walking back to the Petitioner's car, and the Petitioner informed Mr. Jamar Medaries that Ms. Martin did not want to leave but that the Petitioner was leaving. The Petitioner testified that Mr. Jamar Medaries then said, "I'm still going to shoot this b***h up." As she walked away, shots were immediately fired.

---

[1] Ms. Taliaferro was one of the victims of the attempted first degree murder charges. The Petitioner identified her by her first name at sentencing and her last name at the post-conviction hearing.

The Petitioner agreed that her girlfriend had decided to stay with a previous girlfriend and that the Petitioner was angry that a bullet hit her car. She agreed that she could have called the police but instead chose to call her uncles, whom she knew to be affiliated with a gang and one of whom carried a weapon.

The trial court sentenced the Petitioner to twenty-one years for her conviction of attempted first degree murder without bodily injury to be served concurrently to the agreed upon six-year sentence for each of her reckless endangerment convictions, for an effective sentence of twenty-one years. After the sentencing hearing, the Petitioner filed a waiver of appeal regarding this sentence.

## Post-Conviction Proceedings

The Petitioner filed a petition seeking post-conviction relief. She testified at the post-conviction hearing that she did "[n]ot exactly" understand her pleas and that she was attempting to reduce her exposure by entering the pleas. The State's plea offer allowed her to choose between twenty years on the attempted murder charge or a plea to attempted murder with the trial court to set the sentence. She understood that by entering the plea to the attempted murder charge, she would serve a sentence between fifteen and twenty-five years. She also understood that by pleading guilty to the lesser included offense, she would become eligible for release after serving thirty rather than eighty-five percent of her sentence. The Petitioner believed that she had sufficient time to make the decision to plead guilty and stated that she discussed it with her mother. She acknowledged that she had a "couple of days" to consider whether she wanted to enter a plea, and that she did not "feel rushed." She also testified that she and trial counsel discussed the facts of her case numerous times and that she reviewed discovery before she made the decision to plead guilty. The Petitioner stated that she did not want to go to trial because she feared what witnesses would testify to during the trial.

The Petitioner stated that trial counsel did not discuss any potential defenses with her prior to advising her that she should plead guilty. The Petitioner testified that she only returned to the house because she feared that Ms. Martin was being "held hostage" and wanted to help her leave. She reiterated her sentencing testimony that once she discovered Ms. Martin wanted to stay, she began to depart but that Mr. Jamar Medaries unexpectedly shot at the home.

On cross-examination, the Petitioner acknowledged that she understood the rights that she was giving up by pleading guilty. She pleaded guilty because she feared testimony from Ms. Jackson, her uncle, and from witnesses who would have stated that she made a statement about the house being "shot up."

Trial counsel testified at the hearing that he reviewed with the Petitioner the discovery that the State had provided. Trial counsel utilized a private investigator to aid in the Petitioner's case. He advised the Petitioner that she should consider the State's plea offer after discussing "all the pros and cons" of proceeding to trial. Trial counsel specifically recalled discussing criminal responsibility and her sentencing exposure with the Petitioner.

When asked on cross-examination why he did not discuss self-defense or defense of another as possible trial strategies, trial counsel responded that he did not consider those defenses to be viable because of the time that had lapsed between the two shootings. Trial counsel further explained that "there was no immediate threat of serious bodily harm or death at the time they returned," which, according to other witnesses, was fifteen to twenty minutes later.

The post-conviction court entered a thorough written order denying the Petitioner relief. The post-conviction court summarized the Petitioner's and trial counsel's testimonies during the hearing and accredited trial counsel's testimony. The post-conviction court found that the Petitioner understood that she had the option to proceed to trial or accept a plea offer. The court noted that the Petitioner testified that she understood that she could accept the plea offer with a known sentence of twenty years or she could enter an open plea and could face a sentence of twenty-five years. The post-conviction court determined that the Petitioner "appears to be suffering from a classic case of 'Buyer's Remorse,' in that she is no longer satisfied with the plea entered and the gamble she took by choosing to enter an open plea subject to a sentencing hearing."

## ANALYSIS

A petitioner is entitled to post-conviction relief from any conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. The petitioner has the burden of proving the allegations of fact in the petition by clear and convincing evidence. T.C.A. § 40-30-110(f); *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)).

Both a claim of ineffective assistance of counsel and a claim that a guilty plea was not knowing and voluntary are mixed questions of law and fact. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015); *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010). An

appellate court reviews de novo with no presumption of correctness the post-conviction court's conclusions of law, its determinations of mixed questions of law and fact, and its application of law to factual findings. *Kendrick*, 454 S.W.3d at 457. "The trial judge's findings of fact are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence preponderates against those findings." *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003).

To establish an ineffective assistance of a counsel claim, the Petitioner "must show that counsel's performance was deficient and that the deficiency prejudiced the defense." *Wiley v. State*, 183 S.W.3d 317, 329 (Tenn. 2006) (citing *Strickland v. Washington*, 466 U.S. 668, 692 (1984); *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996)). This court "need not address both elements if the petitioner fails to demonstrate either one of them." *Kendrick*, 454 S.W.3d at 457. To establish deficiency, the Petitioner is required to show that trial counsel's actions "fell below an objective standard of reasonableness under prevailing professional norms." *Wiley*, 183 S.W.3d at 329. Trial counsel's performance is not deficient when the advice given is "within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In order to establish prejudice as a result of trial counsel's deficient performance, the Petitioner "'must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different.'" *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (quoting *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006)). When the case involves a guilty plea, "a petitioner must establish that but for counsel's deficiency; [s]he would have gone to trial instead of entering the plea of guilty." *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002) (citing *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)).

The Petitioner contends that her plea was not voluntary because trial counsel failed to adequately explain the consequences of entering a plea and the potential sentencing consequences. She asserts that she was young at the time of the offense and that she did not have sufficient time to consult her parents or to weigh her options. As the State points out, this argument is not consistent with the Petitioner's testimony and the post-conviction court's findings during the post-conviction hearing. At the post-conviction hearing, the Petitioner agreed that she understood the plea agreement, that she had a "couple of days" to consider whether she wanted to enter a plea, and that she did not "feel rushed." The Petitioner also testified that she understood that the trial court would impose a sentence between fifteen and twenty-five years. We conclude that the record supports the post-conviction court's finding that trial counsel thoroughly reviewed the plea agreement with the Petitioner and that the Petitioner understood the nature of the pleas. *See Nichols*, 90 S.W.3d at 586.

The Petitioner maintains that trial counsel was ineffective for failing to explain and pursue self-defense or defense of another as a viable defense strategy. She argues that self-defense or defense of another would have been a viable defense at trial because she believed Ms. Martin was being held in the apartment against her will and because she was not engaged in unlawful activity at the time of the shooting and thus had no duty to retreat. In her appellate brief, the Petitioner argues that a reasonable jury could have accepted a theory of self-defense or defense of another because she did not have a duty to retreat. *See State v. Perrier*, 536 S.W. 388, 408-09 (Tenn. 2017) (holding that there is no statutory duty to retreat when the defendant is not engaged in unlawful activity). Trial counsel, however, explained that self-defense was not a viable defense theory because of the time that passed between when someone shot at the Petitioner and when the Petitioner and co-defendants returned to the house. *See State v. Sean Angelo Davenport*, No. E2018-01273-CCA-R3-CD, 2019 WL 3992472, at *6 (Tenn. Crim. App. Aug. 23, 2019) (upholding the jury's finding that the defendant did not act in self-defense when he left a residence after a fight and returned moments later to shoot the victim); *State v. Bult*, 989 S.W.3d 730, 732 (Tenn. Crim. App. 1998) (determining that person's belief that there is an imminent danger of death or serious bodily injury must "meet an objective standard of reasonableness to be justified"). Trial counsel was not deficient for not advising the Petitioner to not rely on a theory of self-defense or defense of another.

The post-conviction court determined that the Petitioner's plea was voluntarily, knowingly, and intelligently entered. The post-conviction court noted that at the plea hearing, the trial court thoroughly explained the consequences of entering the plea. The post-conviction court found that the Petitioner advised the trial court during the guilty plea hearing that she had "thoroughly discussed her case with trial counsel, including potential witnesses and possible defenses." The post-conviction court accurately described the Petitioner's appeal as "a classic case of 'Buyer's Remorse,' in that she is no longer satisfied with the gamble she took by choosing to enter an open plea subject to a sentencing hearing."

This court "will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve." *Vaughn*, 202 S.W.3d at 115 (quoting *Nichols*, 90 S.W.3d at 586). Here, the post-conviction court made extensive factual findings in its written order denying the Petitioner relief. We conclude that the Petitioner has failed to demonstrate that trial counsel was deficient in advising her to enter a guilty plea. We need not address the second *Strickland* element because the Petitioner has failed to establish that trial counsel's performance was deficient. *Kendrick*, 454 S.W.3d at 457.

**CONCLUSION**

Based on the foregoing, we affirm the judgment of the post-conviction court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE